**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| YASUO KAMATANI, ET AL., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 2:03-CV-437 (TJW) |
| BENQ INC., ET AL., | § | |
|     Defendants. | § | |
| | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court is Plaintiffs' Second Omnibus Motion for Sanctions (#192). For the reasons set out below, the Court denies Plaintiffs' Motion as it relates to sanctions but carries with the case Plaintiffs' request to find this an "exceptional" case.

**I.    Introduction**

At the outset, the Court notes that Kamatani has filed numerous requests for sanctions in this case (the Court believes this represents the 4th request) and, due to the behavior of BenQ, this Court granted much of the relief Kamatani requested. However, the relief requested by Kamatani in this motion is unwarranted. Kamatani's motion is ripe with inaccuracies and seeks sanctions that are not predicated on the law, but on the hope that one more straw might break the camel's back and result in death penalty sanctions against BenQ. Over-reaching by Kamatani in this motion based largely on the black cloud hanging over BenQ comes dangerously close to warranting sanctions not against BenQ but against Kamatani. As this Court noted in its Order of August 5, 2005, Kamatani's conduct in this litigation has been far from pristine but simply an

example that all things are relative.[1]  In the instant case, the Court finds that Kamatani's conduct

and its briefing is far more offensive than BenQ's conduct.

The Court will turn to Kamatani's motion directly, but would also raise the following

issue for the parties to consider.  This case represents the worst form of litigation conduct this

Court has ever encountered.  There have been numerous sanction motions, blatant disregard of

orders, and numerous misleading statements made in Court and in briefs.  Kamatani's motion is

just one more example of this.  Kamatani engages numerous times in making statements in its

briefs that, if not quite false, are misleading.  After BenQ pointed many of these misleading

statements out in its response, Kamatani shrugged these statements off in its reply as mistakes or

in some cases even ignored them.  Instead, Kamatani just continued to cry "foul" in the hope that

this Court will rely on repetition rather than facts.  Kamatani has been a first-hand witness to how

unkindly the Court feels about misrepresentations and misleading statements when BenQ

engaged in it repeatedly throughout this litigation.  The Court will not tolerate any further

unprofessional behavior from either party.  Both parties are warned that, in any further briefing or

in conduct during trial, misleading statements will be dealt with harshly.  Thus, the parties should

be extra careful to give full disclosure of relevant information, not hide the ball, and do

everything in its power to make sure this Court is not misled in the future.

## II.    **Kamatani's Motion for Sanctions**

The Court will now turn to the relief requested by Kamatani in its Second Omnibus

Motion for Sanctions.  Kamatani seeks to (1) prevent BenQ from calling witnesses not disclosed

---

[1]  The opposite is true regarding the issues raised in this Order.  The conduct of BenQ described in the briefs is far from perfect.  However, it is a far cry from the Hitlerian conduct Kamatani seeks to paint it as.

pursuant to Rule 26, (2) prevent BenQ from offering any evidence of "costs" related to the DVD drives, and (3) prevent BenQ from introducing "new" documents in expert reports.  The Court also notes that Kamatani seeks an order finding this case "exceptional" based on BenQ's litigation conduct and relationship with Philips.

A.    Issue Regarding Failure to Comply with Rule 26(a)(1).

First, Kamatani requests sanctions to prevent BenQ from calling eleven witnesses not disclosed on BenQ's Rule 26 disclosures.  Kamatani directs this Court to October 14, 2004 when BenQ was required to file disclosures pursuant to this Court's Discovery Order.  In those initial disclosures, BenQ did not identify any individuals with knowledge of relevant facts.  In November, 2004, BenQ supplemented those disclosures to add employees Angus Lo and Oliver Lin, but did not add anyone else.  On July 25, 2005 (the discovery deadline), BenQ also added two more individuals, Timothy Tropp and Fred Pruner.

However, on October 11, 2005, BenQ filed amended disclosures adding 11 "new" individuals identified as having knowledge of relevant facts.  Kamatani claims surprise and prejudice from these 11 newly identified individuals and seeks sanctions preventing any of these individuals from testifying at trial.

1.    *Kamatani can not show surprise*

Kamatani did not show – and cannot show – that they have been surprised by these "new" witnesses.  The first "new" witnesses is Oliver Lin, who was identified long before the discovery deadline.  Thus, Kamatani cannot be heard to complain about his designation.

The next group of witnesses are seven 30(b)(6) corporate witnesses.  These corporate witnesses' names were within Kamatani's possession before the discovery deadline.  In fact, all

of these witnesses had been deposed by Kamatani before the discovery deadline on more than 160 different 30(b)(6) topics.  Thus, theses witnesses can hardly be a "surprise" to Kamatani.

BenQ also identifies two witnesses that it labeled as "replacement" witnesses. Apparently, there were two individuals that BenQ did identify before the discovery deadline but that subsequently left BenQ after the discovery deadline.  Thus, BenQ identified these witnesses to replace the departed employees' testimony.  These "replacement" witnesses are the first two witnesses that Court finds would be a surprise to Kamatani but, from the record, the names of these witnesses were communicated to Kamatani as soon as possible.

The last witness is a "new" witness as well.  BenQ identified an individual after the discovery deadline who was in charge of optical storage at BenQ that could have been identified much earlier.  However, BenQ has irrevocably stated that this individual would not be called at trial.  Any complaint regarding BenQ's late identification of this witness would therefore be moot.  The Court will enforce BenQ's agreement not to call this witness.

Thus, there are only three witnesses that can truly be called "surprises" out of the eleven witnesses Kamatani complains of.  Further, BenQ only seeks to have two of these witnesses testify.

2.     *Kamatani can not show prejudice*

Kamatani can not show any real prejudice from BenQ's late disclosure.  BenQ, in an obvious attempt to minimize the impact of the late disclosure, offered on October 13, 2005, to allow Kamatani to depose those witnesses not timely identified.  As jury selection was more than four months away, BenQ's offer was reasonable.  However, Kamatani refused to depose any of the newly identified witnesses.

In an additional effort to resolve the issue, BenQ then offered to limit the testimony of the witnesses to their testimony during their respective 30(b)(6) depositions. Rather than agree to this reasonable approach, Kamatani asserted that this position was a trick by BenQ to "ambush" Kamatani at trial by getting in new testimony. Instead, Kamatani would only agree to allowing BenQ to use deposition designations.

Kamatani's sole support for its allegation that BenQ would attempt to bring in new testimony was an October 13, 2005, letter from BenQ's counsel that stated that BenQ would limit the testimony to 30(b)(6) topics and whatever else Kamatani went into during the 30(b)(6) depositions. Kamatani asserted that this would give BenQ wiggle room to bring new testimony in. Notwithstanding the fact that this Court will resolve any such dispute at trial, Kamatani can not show that it is prejudiced when BenQ makes such a reasonable solution. The Court will therefore limit the testimony to what was disclosed in the deposition.

Kamatani, in its motion for sanctions, omitted any discussion of letters sent by BenQ after October 13, 2005. On October 24, 2005, BenQ offered to limit the testimony only to 30(b)(6) topics and withdrew the additional topics Kamatani raised in the depositions. For further clarification, BenQ sent another letter on November 2, 2005 stating "we do not intend to have the Rule 30(b)(6) designees testify outside the area of their noticed topics. Please do not suggest otherwise." Of course, Kamatani did suggest otherwise in its motion.

As for the two "new" corporate witnesses, they were identified to replace Oliver Lin and Picky Wu who left BenQ. As noted above, these witnesses were identified as soon as possible. However, to minimize the prejudice from their late disclosure, BenQ stated that these witnesses would agree to be bound by the testimony of their predecessors – even though there was time for

additional depositions if Kamatani had wanted to take them.  The Court will enforce BenQ's agreement.

3.    *BenQ's explanation*

BenQ also provides a reasonable explanation for its failure to get the names of known witnesses on the list.  The vast majority of the corporate depositions took place right after new counsel took over the case.  During that time, BenQ asserts its lawyers were getting up to speed on the case and complying with discovery and sanction orders that this Court stressed was of critical importance.  The Court will accept as true BenQ's assertion that the frenzy of this time frame resulted in the oversight of adding the corporate witness names to its disclosures.

The Court does note that BenQ's behavior in not timely identifying some of its witnesses was sloppy and failed to strictly comply with the Federal Rules and the orders of this Court.  However, Kamatani has not shown surprise or prejudice.  In fact, BenQ's counsel engaged in the type of conduct this Court expects of lawyers once a mistake is discovered.  BenQ offered the witnesses for deposition and when that was unsatisfactory, offered to limit their testimony.  Accordingly, the Court does not sanction BenQ for its conduct and holds that, BenQ's witnesses will be allowed to testify in accordance with their testimony on the 30(b)(6) deposition topics and on the issues Kamatani *voluntarily* went into during the deposition.

B.    Issue regarding Privilege Documents

Second, Kamatani challenges BenQ's handling of certain types of privileged documents.  Back in May, 2005, this Court ordered that BenQ provide certain documents for *in camera* inspection.  These documents were based on BenQ's unilateral decision to drop its lawsuit with PBDS and Philips.  After reviewing the documents, this Court ordered, on November 8, 2005,

that the common-interest privilege did not attach to documents between BenQ and PBDS or Philips and ordered that certain documents provided *in camera* be produced.  The November 8, 2005, Order also held that the other documents produced *in camera* were protected under applicable privileges.

Kamatani's complaint appears to be an alleged "shelving" of documents and violations of this Court's orders.  The Court finds neither assertion can be supported.  It appears that BenQ had labeled 258 pages[2] as attorney-client privilege documents on its privilege log but that were actually protected under the common-interest privilege.  It is BenQ's position that the common-interest privilege is a subset of the attorney-client privilege and that BenQ labeled them under the broader category.  Regardless of the soundness of BenQ's position, BenQ sent a letter to Kamatani explaining its position.  Furthermore, the privilege log itself clearly indicates that these documents are to and from Philips and BenQ, which would require a common-interest privilege in order to be protected.

Kamatani also mis-states this Court's order of November 8, 2005 and stretches it to require BenQ produce all previously held common-interest privileged documents by November 9, 2005.  However, the November 8, 2005 Order only required that those documents reviewed by the Court be produced by November 9, 2005 — which it appears that BenQ did.

A week later, BenQ also produced all other documents it had withheld under the common-interest privilege.  Whether as a result of this Court's order or in response to

---

[2]  In regard to the privileged documents, Kamatani repeatedly asserted that there were 258 documents on BenQ's privilege log that were withheld.  In fact, there were only 28 documents totaling 258 pages.  Whether purposeful or not, Kamatani was severely inaccurate regarding the difference between pages and documents on numerous issues in its brief.

Kamatani's correspondence, BenQ produced the documents it should have.

At the end of the day, Kamatani does not really request any relief on this issue.  Instead, Kamatani uses these documents to raise straw men arguments regarding the alleged bad conduct of BenQ.  This Court is well aware of the sanctionable conduct committed by BenQ in this litigation; appropriate remedies have issued. However, Kamatani's attempt to cloud relevant issues with more allegations of bad behavior wastes the Court's time. Kamatani continues to cry foul and asserts that there *could* be more "hidden" documents.  However, Kamatani seeks no relief and has not filed a motion to compel pointing to any documents on the privilege log that it believes are being improperly withheld.  Accordingly, the Court grants Kamatani no relief on this issue.

C.    Issue regarding Netting Agreement

Third, Kamatani raises some issues with the netting agreement.  Some of these positions have merit.  However, in light of BenQ's effort to militate any prejudice and Kamatani's behavior regarding other issues in its brief, the Court will not grant Kamatani any relief on this issue.

Kamatani takes exception to BenQ's late production of documents related to the netting agreement between BenQ and PBDS.  While all license defenses have been stricken by this Court, netting agreement documents would still be relevant for cost purposes and/or findings of willfulness.  Kamatani seeks a sanction from this Court that would prevent BenQ from offering any evidence of costs associated with the manufacture and sale of DVD drives.

Kamatani establishes that there were netting arrangement documents that were not produced until November 4, 2005.  These documents range in relevance.  However, the Court

finds that the late production of these documents do not unfairly prejudice Kamatani.

Although these documents should have been produced earlier, the actual terms of the netting arrangement itself are detailed in the Joint Venture Agreement at Section 6.1.3 which was produced in December, 2004.  Thus, Kamatani has been aware of the basic terms of the netting arrangement for over a year.  Further, there has been deposition testimony supporting this fact. Moreover, the vast majority of these new netting arrangement documents were produced prior to a 30(b)(6) deposition in which Kamatani used the documents extensively.  Thus, Kamatani's claim of prejudice rings hollow.

Kamatani's complaints regarding BenQ's use of these documents also fall flat.  BenQ's expert relies on the Joint Venture Agreement (which was produced a year ago) to help establish costs – he does not use the newly produced documents to do so.  The other parts of his report that do use the documents result in additional profit for BenQ.  Thus, his use of these documents appears to favor Kamatani.  Once again, the Court is hard pressed to find evidence of prejudice.

D.    Expert Report Documents

Fourth, Kamatani requests sanctions arising from BenQ's inclusion of documents in the rebuttal report of one of its experts.  This request is meritless.

Kamatani complains that BenQ is using an expert report to introduce hundreds of documents into evidence that were not produce before the discovery deadline.  The Court first notes that, rather than the hundreds of documents asserted by Kamatani, there are 87 documents totaling 246 pages that were submitted with BenQ's rebuttal report.  Contrary to Kamatani's allegations, the Court finds that these documents were not "hide the ball" documents, but documents BenQ's expert collected from general sources (mainly the Internet) as part of his

review process in forming the rebuttal report.  BenQ was under an obligation to produce these documents and it did so.

Many of these documents are public websites or summary tables prepared by BenQ's expert.  Ironically, the Court finds that the summary tables are very similar to the ones prepared by Kamatani's expert.

The document Kamatani seems principally concerned with is a report from Techno Systems Research.  It appears to be a CD containing 160 pages of summary reports regarding the DVD drive industry.  Kamatani complains that it has requested this type of information for many months.  However, as Techno Systems Research is clearly a third party, BenQ was under no obligation to produce the information.  Further, Kamatani offers no explanation for why they did not purchase the report months ago if it was so important to their case.  The Court simply will not credit this argument.

In summary, BenQ's expert gathered background documents of the DVD industry that he used to formulate his general opinion that the DVD drive market is highly-price competitive and could not withstand high royalty margins.  The Court finds that these are the very types of documents experts might choose to find, review and produce in forming rebuttal opinions.  In essence, Kamatani is moving for sanctions because BenQ *complied* with its discovery obligations relating to experts.  There is no merit to this request.

E.    Conspiracy Theory

The last issue raised by Kamatani has perplexed this Court for some time.  As a result of recent documents produced, Kamatani raises exception to what is believes is a conspiracy between BenQ, PBDS and Philips to harm Kamatani and seeks a finding that this case is

"exceptional" for this conspiracy as well as for BenQ's litigation conduct.  Notwithstanding

BenQ's explanation (which the Court finds hard to credit), Kamatani has some basis for raising

this issue.

As the Court mentioned during the August Show Cause Hearing, there are "red flags"

regarding the conduct of BenQ and Philips.  However, conspiracy is not a claim in this case.

Further, as the Court mentioned before, Philips is not a party to this litigation so this Court is

limited in its ability to make findings related to its conduct.  However, the Court has reviewed

the documents submitted by Kamatani on this issue and the Court recognizes that Kamatani's

arguments do have some merit.  However, this is not enough evidence for the Court to make the

findings necessary to warrant the sanctions Kamatani seeks.  Thus, the Court takes Kamatani's

request to find this case "exceptional" under advisement and will carry this request with the case.

SIGNED this  6th  day of January, 2006.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE